This morning will be construction of General Labor's Union 330 against the Town of Grand Chute. Mr. Eisenberg? May it please the Court, my name is Nathan Eisenberg. I represent the plaintiff appellants in this case, Labor's Local 330 and Kelly Boss. The Sixth Circuit correctly applied the standard for evaluating the temporary use of an inflatable rat during a labor protest on a public right-of-way in Tucker versus the City of Fairfield. In that case, the Court found that the application of a local sign ordinance was not narrowly tailored. So Mr. Eisenberg, before you get too much further with that, I would like you to tell me what relief you are currently seeking because it appears that this construction project is long since finished. So I'm assuming, but you can correct me if I'm wrong, that there's no reason why you would be putting the rat out in front of Colosso anymore. So what's the status of your request for relief? We want the ability to use the rat, not just in this case, but in other situations. In Grand Chute? Yes. The Local 330 has jurisdiction in that municipality. It's a place where they do work. And this presents a problem if they're not able to use the rat in this type of situation in the future. Is there any indication that there is a problem at the moment? I'm wondering whether this is advisory or what the status is. I gather you were originally asking for damages as well as injunctive relief? I think we are asking for injunctive relief. You really just want injunctive relief? You want us to say that in general the rat has to be used? Or are we talking about striking this ordinance down as a facially invalid ordinance? No, I think as applied to the rat, the union wants the ability to use the rat when it engages in these activities in the town of Grand Chute. Do you need to make any kind of showing of capable of repetition yet evading review? Why not address the situation the next time it comes up? Maybe the rat wouldn't be a structure at that point, or maybe there wouldn't be the alleged safety concerns. Well again, because the union is geographically located in this area, Grand Chute is a sizable community next to Appleton where the union is headquartered. This is something that is very likely to come up again. And it's something that the union wants to be able to use the rat without having to go through this whole thing again. So it's not something that was going to happen one time and then we don't foresee happening again. If that was the case, I think your concerns might be well founded. But the union strongly believes that this is something that's going to come up again. And now there's already this precedent that they cannot use it under the way that the Grand Chute is applying the ordinance in this case. So are you conceding that an ordinance that just says there will be no signs, whatever, except for traffic signs? You know, a stop sign, yield, one way, whatever. You would concede that that kind of ordinance is valid under Reed against Gilbert and similar cases? Well, I think a sign like that is not narrowly tailored where it addresses the situation. You don't think a municipality can have an ordinance that says there will be no signs on public rights-of-way except for traffic signs? I think, first of all, that's not this case where there's plenty of evidence in the record that there are lots of signs on the right-of-way. I don't think that the town of Grand Chute has done that here. I mean, that could be important, but I'm just trying to start with, you know, where do you come into the picture? And so you would concede, if they really were limiting signs in the public right-of-way to the kind of traffic signs I mentioned, that you would regard that as lawful or not? I'm not sure that I would, because that would effectively foreclose the speech such as this, where the union is engaging in a protest and wants to use the inflatable rat in furtherance of those protests. So an ordinance like that is far broader. That ordinance sounds a lot like the regulation that was sustained in Clark against Community for Creative Nonviolence, which also entailed structures. And I'm a little puzzled that neither side has discussed Clark. Do you have any views about its significance for this litigation? I'm not sure that I do, since neither side has discussed it in the briefing. So you're unaware of it as well as undiscussing it. That is accurate. But I think that the Sixth Circuit's decision in Tucker is also consistent with cases from this circuit, cases like Weinberg v. City of Chicago and others. And I don't think that the town in this case has ever seriously made any effort to articulate why the temporary usage of the rat. And we're talking about situations for a couple hours at a time while the protesters are there, so extremely temporary. And they've never tried to articulate how limiting speech in those situations is narrowly tailored to its interest. What happens to the rat when it's not on exhibit? At the end of the protest, the rat is deflated. It's what, I'm sorry?  Oh, it's deflated. Yeah, so the rat, I mean, it takes a minute or two to inflate. When they are done at the end of the day, they deflate it, they pack it up, they take it home. And in fact, in this case, there's a record of situations where the union was really trying very hard to make sure that there were not safety considerations. They were trying very hard to be respectful. How far is the rat from the highway, whatever it is, the road, the main road? Well, there are two different spots where the rat was inflated in this case. The main road, College Avenue, which is the road from the highway into the town of Appleton, has a main body, which is a fairly fast-moving road. And then there is a frontage road. So initially, this was placed on the median between the fast-moving part of College Avenue and the frontage road. And then later on, it was moved just to the frontage road. So it was on the side of the frontage road. Well, I see. There isn't much going on on the frontage road, is there? That's exactly right. It would not be traffic. And then the traffic on College Avenue is sort of, it's a heavily trafficked road. I think it's the most trafficked road in the town of Grand Chute. So you have traffic moving fast. Do we know how far the rat, when it's next to the frontage road, is from College Avenue? Well, there's pictures of it in the record, exactly where the rat is placed. I don't know if we have measurements to that effect. But it's not adjacent to Collins. It's on the right. It's a considerable distance, isn't it? Just from the pictures. Well, when it was on the median, it was right next to College Avenue. And then when it's on the right-of-way next to the frontage road, it was a little further back. So is it willing to move the rat significantly away from Collins in the direction of the frontage road? The issue is not moving it closer or further away from College Avenue. There was two concerns. One is there was a jurisdictional issue that when it was on the median, it turned out to be in the city of Appleton and not in the city of Grand Chute. And because the communications that the union had had were with the town of Grand Chute and they wanted to make sure they were doing things properly with Grand Chute, they stuck with Grand Chute. So they actually squished it on the little bit of the right-of-way that's right next to the dealership once they move it. Is that right? That is correct. Because the concern is that the farther away that the rat is from the actual target of their protest, this runs into real concerns with the use of the rat under labor law. We don't want to have the rat a block away where it's in front of another business and the rat could be deemed. And that's not totally hypothetical because the alternative that the town had offered with the rat was you put it on a flatbed trailer and you drive it around the block. So they never offered to just let you park the flatbed trailer in front of Colosso or on the median or anything? Not at that time. I think, and this is laid out in some detail in the briefing, is that as time went by there had been different formulations of what the union may have been able to do. But at the time when the police came out and said you have to remove the rat, what they said is you can put it on a trailer, but the trailer can't be stationary. The trailer has to move. And at that point the union, knowing that it didn't want to get into some sort of secondary issue where it was putting the rat on neutral employers, said we can't do that, even if by some stretch of the imagination you can actually drive with an inflatable rat on a flatbed truck, which really begs the question about the safety concerns that the town was raising in the first place. So I imagine, though, that if the rat's over on the part of the right-of-way, not on the median but across the frontage road, it's actually a little bit further away from the faster-moving traffic on College Avenue and thus probably less of a traffic factor. We don't think there's any traffic factor. I mean, as you point out, it's on a frontage road. It's also in the middle of a block. I mean, the union went out there ahead of time and made sure that the rat wasn't adjacent to an intersection where cars would be turning. They talked about the location of where they were going to do this with the police before they did it. So we don't think that the town can sustain any arguments about traffic given where they moved the rat. And again, the union was willing to move the rat at various times to address concerns because they were very concerned that this not raise a safety issue. And so when you look at the pictures of where the rat ended up, in the middle of a block in front of a construction site, there really is no traffic concern and there's no safety concern and there's really no aesthetic concern. So I want to go back to my original question, which is, to what extent are we really looking at the way the town handled this situation, limited to this case, and how much we're looking at its general policy? Because you did put material in your brief about the way this muscular dystrophy fundraiser was handled and other signs for other purposes. And I thought you were making an argument that no matter how this ordinance was worded, that in fact there was a tremendous amount of discretion and that there were other things that were comparable enough to your rat that the town should allow everything for expressive reasons. Sure. Well, and we're talking about the different prongs of that forum analysis. And the Sixth Circuit in Tucker really relied on the narrowly tailored aspect of that forum analysis. And we only need to show that one of these prongs is met. And so that's why I bring up the narrowly tailored as a really difficult prong for the town to meet. That's one reason why I asked about Clark against Community for Creative Nonviolence, because the Supreme Court held that if you ban all structures in a public area, there's no need to show that anything is narrowly tailored to anything else. Okay. But in cases in, well, Tucker, but also cases in- But I take it your position is that although the town may have passed an ordinance that looks like it's banning everything, that it in fact isn't banning everything. And that would perhaps take it out of the Clark rule and put it into a very different category. Yeah, because my client is really quite frustrated where the rat is treated as a sign on the right-of-way and it's a problem, and then you look at various parts. I have a question about this line of argument, though. Is there any advantage to telling the district court to redo the preliminary injunction hearing as opposed to just saying go hold the hearing on a motion for a permanent injunction and get all this in the record and pin down all the factual disputes? What's the point of another preliminary injunction hearing? Well, because we don't have just the preliminary injunction, but we also have the summary judgment at this point where we also went through the entire process and they threw out the case. So you think the district judge is not ever going to hold any further proceedings because all the order says is the motion for a preliminary injunction is denied. But then there's the second order on summary judgment that dismisses the case. So, yeah, I mean, again, that gets back to one of my first questions. So you would actually be quite happy then with the remand along the lines that Judge Easterbrook just described saying the final judgment is vacated and the case is remanded for a full hearing on the union's request for a permanent injunction. It sounds to me like that's what you're asking for, but maybe you can tell me how. Right, but when the preliminary injunction was denied and we then went back and we developed a further record about how the town was actually enforcing this ordinance and we had a much more complete record on summary judgment and the judge still dismissed the entire case. And your request for relief then was please give us a permanent injunction? Yes, for judgment in favor of the plaintiffs. I'm just saying like judgment saying what? And if the judgment that you were seeking was for a permanent injunction, then I totally understand why you're here. You're here because you didn't get one. You got thrown out instead. I think that's an accurate assessment. Okay. Well, if you'd like to save any rebuttal time, you may, but I'm not going to force you. I think I will save the rebuttal time. Thank you. Okay. Ms. Rust. Your Honors, Counsel, may it please the Court. My name is Angela Rust from Hinshaw and Culbertson. I represent the Appali Town of Grand Chute. In our view, this case should be about the application of an ordinance and not about the characteristics of any one balloon. And when Your Honor was referencing that Tucker can't overrule the Supreme Court precedent, that's precisely our concern with the way. But, of course, you didn't rely on Clark against community for creative nonviolence either, and I would have thought that that was the Supreme Court's most pertinent precedent. We did not rely on that case, Your Honor. I think there is ample other Supreme Court precedent, though, as well as Seventh Circuit precedent that discusses the narrowly tailored. There's Seventh Circuit precedent, so why bother with the Supreme Court? There's both, Your Honor. I think, actually, the case of Doe versus the prosecutor of Marion County does a nice job of laying out numerous Supreme Court decisions that are on point. I would say perhaps taxpayers for Vincent, in my mind, is one of the most important here. The fundamental difference, of course, is that the approach, the narrowly tailored test, in the Tucker majority opinion, focuses very discreetly on a given example of a balloon and whether under the specific facts of that case and the characteristics of that balloon that there is a harm presented and whether or not then focused on that very specific balloon. If there is any inclusiveness of a balloon that the Tucker court thought was not presenting those harms, we disagree.  Except that there's evidence in the record to show that you're not consistent about that. That's why I was asking the question. If you really just had a consistent practice of no structures, whatever, A, you'd look like Clark, B, one wouldn't have any concern about disadvantaging any kind of expression. But you don't. The record has evidence to suggest that the town is not as pure as all that. And instead it seems to be drawing lines between permanent things that are staked into the ground and things that are leaning up against an easel and you're looking at this muscular dystrophy campaign versus temporary union objections with the rat being there to symbolize the expression. So I'm concerned that, especially given the timing, that the rat sits there until somebody from Colosso calls and complains about it, that sounds like it's a message, a content-based reaction, not just let's keep our town beautiful or clear of any kind of sign. So I think there are two points there that I'd like to address. One is the leaning sign concept and whether that is evidence of some form of a discriminatory, a content discrimination in this case. And the second is the concept of the community complaint, the origin of the enforcement action. As to the first point, the leaning sign concept, there's really no connection between the content of the signs and the basic distinction of whether they are structural or whether they are leaned up against something. The town has tried to exercise... Something that can be taken down in five minutes is structural because there are a few stakes in the ground? I mean, that seems like a very unpersuasive line, actually. You know, if you put an easel and you lean something up against it, that's fine. What's the reason for the distinction? There are differences in the safety hazards presented by them. What safety hazards? So, for example, one of the safety concerns that the town raised to the union is the presence of fire hydrants in that location of the right-of-way and the concept of having a staked-down, inflated balloon that one would have to remove the stakes... What is blocking a fire hydrant? That was the concern, was that the location... Well, why don't they just tell the union, move your rat a few feet so it doesn't block the hydrant? It doesn't necessarily resolve the problem, and that's... Why not? I don't understand. I think it didn't block the hydrant anyway. Isn't it just a little... it's nearby? So, I think this is part of my discomfort and the town's concerns about looking at the specific individual application of one balloon. I don't understand you. You tell me what the hydrant problem is. The problem is that if there are signs of this nature in the right-of-way, and, of course, the town, if it allows these sorts of structures, we have to allow many of them. Look, I understand you don't want your hydrant to be masked by dozens of signs. There aren't other signs. Now, so what is the problem? If the rat is too close to the hydrant for the firemen to be able to attach their hoses to the hydrant, then you tell them to move their rat three feet or something. I would draw an analogy, in this case, to the Lubavitch. I don't want an analogy. I want you to tell me what possible hazard the rat poses. The hazard of accumulation, Your Honor. Of what? Of accumulation of signs. Of accumulation of what? Of signs, of structural signs. That was the holding in Vincent. If you looked only like a... No, wait. The rat is all by itself there. The rat was all by itself some days. There were two balloons on some days. So you expect this very large field between the frontage road and Collins Avenue. You think it's going to be surfeited with signs? Just as in taxpayers for Vincent, if you look at just one sign. Has there ever been a situation in which this field was so covered with signs that the fire department couldn't operate? Or is there some other problem created by the signs? No, Your Honor. And do you reject the difference? It sounds to me like you do reject the difference between temporary signage and permanent structures. I'm not sure I understand Your Honor's question. I believe I agree with you. Well, I'm not taking a position. I'm trying to find out what your position is. And you think there's no meaningful difference, as I understand what you're saying, between something that's a temporary. You put up an easel. It's temporary. You can take it down in five minutes. Or, for that matter, the rat, which we have a record to show it was, in fact, taken down and put up twice a day at least. So you don't think there's any difference between that and building a little log cabin on the side of the road that advertises what a wonderful place in Wisconsin, the Appleton area, is? I agree with Your Honor that there is a distinction, but it's one of degree. It is not, as the Tucker Court found, an absence of the harm. It's the difference between my grabbing a bite-sized candy bar or a full-sized candy bar. The harm's there either way. It's a matter of degree. So what about the idea, though, that the public parts, you know, sidewalks, rights-of-way are, in fact, the place where people express themselves outside? The First Amendment is very protective of the right of our public to express itself. That's right, and there remain other forms of expression available to the union, but the courts have upheld a total ban. But that, of course, would be true if the city forbade speech on sidewalks. Right? No, Your Honor, it's the same. No, there would be plenty of alternatives. Yes, Your Honor, there would be alternative locations, but if it completely forbade all speech on a sidewalk, that would be a different scenario. No one is forbidding all forms of expression in this particular location. There are alternative methods of expression. Why isn't the case governed by McClellan? McClellan is saying you can take up sidewalk space for, you know, First Amendment-protected speech-defined. And it goes further to say that even though there are alternatives, the most effective way of getting the message for the people in McClellan was to be able to approach people on the sidewalk and have a discussion. They didn't want them to be carrying placards. They didn't want them to be further away. Yes, Your Honor. In McClellan, however, the ordinance made it a crime to enter the buffer zone, to even be on the sidewalk. So it had foreclosed all forms of expression. I think that's more similar, not outside the buffer zone. Why wasn't that time, place, or manner? The Supreme Court rules that it wasn't. Thirty-five feet. I'm trying to remember what the buffer zone was. Thirty-five feet. Thirty-five feet. That's not very much. But the buffer zone itself. Or the 35 feet at the back of the courtroom. The buffer zone itself, however, within the buffer zone, it completely foreclosed all forms of expression. And that was the trouble that the protesters, or those who did not want to characterize themselves as protesters and wanted to engage in different forms of discussion, were completely forbidden from any form of expression within the buffer zone. Here, if we look right at the very same location, there are other alternative forms of expression that are permitted under this ordinance in the very same location. It's still not what the Supreme Court said, though. They were talking about the inherent nature of the type of speech that the abortion protesters wanted to have, and that it required one-on-one conversations. A one-on-one conversation 36 feet away from the front door wasn't good enough. It had to be a one-on-one conversation where the appellants wanted to conduct it. I do agree, Your Honor, that there are cases which do give special recognition to one-on-one, to leafleting, to the ability of communicating thoughts directly that would not apply to the construction of a rat balloon. Well, in the rat balloon, they said, you know, if you have little placards, people whizzing by on College Avenue aren't going to see this, and the rat is an immediately salient visual way of conducting the message. There are other alternatives beyond leafleting and hand milling. There are always alternatives. That was true in McCollum and true all the time. In the particular location, though, there was not an alternative at the time under the enforcement of the ordinance in McCollum. There is here they could have as a different part. Look, 35 feet is not a long distance. So if the 35-foot buffer zone had been allowed, then the anti-abortion people would have been standing outside the 35-foot limit with their signs and their chants and all that. So what's the difference? The difference here is that we have not, the town has not relegated the union to a particular distance, whether 35 feet, 5 feet, or longer than that away from their location. They are allowed to engage in the types of activities that the district court identified as involving right there. Well, I don't know that they're not allowed to have their rat on this field. Because the rat is a structural sign. But you're assuming the answer to that question. I suppose if they put together a sign and just had two people holding the rat, actually, how about that? Suppose they inflate the rat, and instead of using stakes, they just have four union members who volunteer to hang on to the lines for the requisite couple of hours in the morning. At that point, you just have people holding this big, giant balloon. Is that okay under your view? I think there are, my answer to whether that's okay is perhaps a different answer than whether it violates this ordinance. No, but that's what I'm asking. If that's what the union had been doing, no stakes in the ground, just four burly volunteers who have agreed to hold on to the same ropes that were connected to the stakes, would that make it not a structure, more like the flatbed truck, except in the location where they wanted it? Would that have violated this ordinance? Would that have been permissible? I do not believe it would have violated this ordinance. What I am not prepared to tell Your Honors, whether it would have been acceptable under all of the other laws on the books in the town of Grand Chute. Do you think it would make any difference if the rat were filled with helium and floating six inches off the ground? I do not believe it would be a structural sign that falls within the ambit of this right-of-way ordinance if that was the case. Again, whether it's advisable is perhaps a different issue, whether it's okay, but I do not believe it would fall under that. Yeah, my next question was what if it was filled with hydrogen? I think we would all agree that would be highly unadvisable. So what was the complaint that Colossa made? Your Honor, I do not know the details of the communication. Well, isn't that important? What if they said, look, we're in Grand Chute, this is the home of the John Birch Society, we don't like unions, and we don't like the idea of this union denouncing our company. So we'd like you to get them off, get their rat out of there. I think there would be all sorts of... It's very insulting to have a rat making fun of us. I cannot represent what the specifics are. They're not in the factual record. But let's assume that that were true. Well, isn't that important? Because if it turns out that the city just is kowtowing to a company that has a political dispute with a union, that would be pretty questionable, wouldn't it? The town has not... Would it be questionable or not? No, Your Honor, I do not believe there's an obligation of the town to inquire about the reason that association... You're talking about inquiring. I'm saying the company comes to the town manager and says, get rid of... We don't like unions in this town. So get rid of that rat. And the manager says, well, yeah, you're a big company, and, you know, John Birch Society, birthplace of Senator McCarthy. Sure, we'll do it. We'll set down the rat. Is that okay? That is not okay. That second part of what Your Honor said is the important part. How do we know this isn't what happened? Because what would be the case in the... How do you answer my question? How do we know this isn't what happened? There's absolutely... How are you going to answer my question? How do we know this didn't happen? Because all of the factual evidence in the record of all of it, none of it suggests that the town did what Your Honor described and said because of the reaction of Colosso, we are enforcing this, as opposed to because of the ordinance language that precludes this type of structure. I'm not sure that's true, though, because the rat's up for a couple of days before whoever it was from Colosso calls. It's only after the complaint from Colosso that all of the enforcement activity kicks into gear. There is no dispute that what created the... complaint from Colosso, that's undisputed. What we don't have is that second piece of information that would suggest that then the town's reaction was based on a discriminatory intent or the content of the balloon when it got there. For the town to inquire of every citizen complaint, whether it's based on some discriminatory animus, and what if it is, then to somehow grant immunity to an otherwise illegal sign, that has never been the case. The basis for the inference would be the fact that the rat is rather visible, and you would have expected some police officer or some city employee to have noticed it during the two days, but it was overlooked until the employer complained. That might be the basis for an inference of hostility to the union. Your Honor, I think that would be an example of imperfect enforcement, and there certainly is that. Well, it might be. The inference could, of course, be disputed, but I understood the question to be do we know enough on this record to resolve it, to resolve or reject that possibility. Well, we don't know the content of the communication from Colosso to the town, so I'm not sure there's enough to give an inference that it was some discriminatory animus on their part. We certainly don't have any evidence that the town's reaction was driven by the content that it had been aware of it. If we had the facts, Your Honor, that they had driven past and they had seen it multiple times, that this one and only code enforcer was aware of it. If this were a race discrimination case, if Supervisor A says to Supervisor B, I don't like black people, please get rid of X, and Supervisor B then gets rid of X, isn't that ordinarily the basis for an inference that B is acting on the basis of race? If the inference might be wrong, right, the possible argument could be refuted, but if just that information, just a complaint and action, could be the basis of an inference, could it not? In the hypothetical that Your Honor describes, I can see the inference, but you would look for that inference based on the action that was taken by the supervisor. Here, when we look at the facts surrounding the action taken by the town, we do not see any content-driven action. Why do you think Colosso objected? Your Honor, I don't know why they objected. Yes, speculate. They could have objected for any of the reasons Your Honor articulated, that they were unhappy with the message. Give me one reason why they might have objected. They might have objected because the rat was very ugly. The rat is not very ugly. Well, I don't necessarily hold that view personally, Your Honor, but they might have. That's one possible reason. Look, do you think they would have done the same thing if the veterans of foreign wars around the 4th of July had decided to put up a giant inflatable Uncle Sam in front of the car dealership? I think that even an inflatable Uncle Sam would have been a structural sign that the town wouldn't complain. Yes, of course, but it wouldn't be removed unless someone complained, right? Or unless the code enforcement officer saw it. Saw it. Everyone's seen it, right? Well, there's no evidence that the officer saw it. How big is Queens Street? It's not that big, and you said at the beginning, or we heard at the beginning of this, that College Avenue is one of the busiest roads in town. Pretty much everybody in town must have seen it over two days. I'm not sure that while our city is certainly not as large as Chicago, it's not that small, and there's no evidence that the code officer, they only have one, actually saw this or that someone had brought it to the town's attention. I think it would be a different case if those were the facts before us, but here they're not. Okay. I do, too. Well, thank you very much. Thank you. Anything further, Mr. Eisenberg? Just very briefly, in addition to what you're talking about on College Avenue, it was also on the front page of the local paper. There was a giant picture of the rats, so it was well known. Do we know what percentage of the people read the local paper? I wouldn't hazard to guess. In many cities, that's close to zero. I think it's higher than zero, but I wouldn't hazard to guess. But the point that I did want to make is you were asking some questions that I think are really troubling for the town in terms of haphazard and inconsistent enforcement. Has there ever been any traffic accident that was attributed to people staring at the rat and mesmerized by the rat? Not to my knowledge. And that's actually why the police went out ahead of time, or they went out and they told the police, this is where we're going to be, and they checked ahead of time. Does the record show that they alerted the police to the fact that they planned on using the rat, or did they just say we're going to protest Colosso's wage policies? I do not believe they told them there was going to be a rat there. I would assume that if they had to get police approval before they put the rat on there, that would be a prior restraint problem. But the point I wanted to make is the distinctions between the stake sign, the leaning sign. And how about the sign held up by the people? Yeah, but there's all of these different signs, and there's not a real rational basis for making these distinctions. By the way, how large is the cat? If the rat is 15 feet, shouldn't the cat be 100 feet or more? That would present different issues with air traffic. But I don't know. But this court in Weinberg specifically talked about a haphazard approach of allowing some speech and not other speech. And that's exactly what the town is left with with its arguments about leaning signs and stake signs, leaning on easels or being held by protesters. And that's really what's going on here. There is no evidence whatsoever that the town ever tried, through evidence, through traffic patterns or anything, tried to show that community aesthetics or safety were implicated here. Thank you. All right, thank you very much. Thanks to both counsel. We'll take the case under advisement.